No. 22111.

HAROLD A. RAYOR AND CONNIE P. RAYOR *v.* AFFILIATED CREDIT BUREAU, INC., A CORPORATION.

(455 P.2d 859)

Decided June 23, 1969.

WALLACE & HAHN, ANDREW S. ARMATAS, DAVID J. HAHN, for plaintiffs in error.

HYMAN D. LANDY, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE GROVES.

AFFILIATED CREDIT BUREAU as assignee of Denver Dry Goods Company (called Denver Dry) brought an action against the plaintiffs in error to recover judgment for $101.17, interest and costs, representing the sales price of merchandise purchased by use of a credit card. Judgment was granted as prayed.

The credit card involved was a B "Charga-Plate" issued by Denver Charga-Plate Associates. During the time involved this firm acted for four Denver stores, including Denver Dry, and the Charga-Plate was recognized by each of these stores. Under the rules involved a B Charga-Plate was issued to a husband and was to be used only by him (an A plate being for a wife and a C plate being for an "authorized purchaser"). The Charga-Plate in question was issued to the defendant husband. However, the defendant wife signed her name — Connie P. Rayor — as the identifying signature on the back of the plate. On May 6, 1964 this plate, or a duplicate thereof, was used at Denver Dry in purchase of merchandise involving seven separate sales slips. Each of these slips was signed "H. A. Rayor." The defendants testified that neither: had signed the charge slips; had purchased the merchandise; knew anything about the purchase of the merchandise until receiving a statement of account around June 1, 1964; and, except for the information contained on the sales slips, knew anything about the purchase of the merchandise or its whereabouts.

The defendants further testified that Mrs. Rayor always kept possession of the plate in a particular place in a billfold which in turn was kept in her purse. She testified that she had used the plate at the May D&F store at the beginning of April 1964 and then returned the plate to its customary place. She made no further use of the plate and upon receiving the bill around June 1, 1964 found that the plate was in its usual location in the billfold inside the purse. She immediately went to Denver Dry and reported her version of the matter to the credit manager. She stated that about the same time the pur-

chases were made at Denver Dry some unknown person made purchases at the May D&F store with this or a similar plate.

There was no testimony as to circumstances surrounding the purchase of the merchandise, except the introduction of the charge slips in evidence. An officer of Denver Charga-Plate Associates testified that his organization had prepared only one of the plates issued to the husband. The "B" on the plate was blurred, as was the "B" on the plate used on the charge slips. There was no expert testimony as to whether or not the issued plate was the one used in making the purchase. It was brought out that ofttimes sales clerks did not require identification of the person using the plate nor compare the signature on the back of the plate with that made by the purchaser on the charge slip. The court compared the signatures of the defendants with those on the charge slips and indicated that, while he was not a handwriting expert, those on the charge slips did not appear to have been made by either defendant. At the time the purchases were made, the only other occupants of defendants' home were their three children, ranging in age from $3\frac{1}{2}$ to 8.

Credit cards frequently have printed thereon a statement to the effect that the person to whom it is issued is responsible for all charges made by anyone using the card prior to written notice of loss or theft of it. Nothing of this nature is contained on the Charga-Plate involved. The court refused to permit any evidence as to whether or not any contractual obligations were made by the defendants at the time of the issuance of the plate. The court ruled that, if the plate were lost or stolen, the defendants would be liable for purchases made prior to the time that they notified the issuer of the fact. The court stated: "It's the same as cash, as far as the Court is concerned. * * * this is just like a dollar bill, or five dollar bill. If you lose it, and you can't find it, then you are responsible." The court indicated that he thought that neither of the defendants had made the purchases.

Our disposition of this matter is solely under the court's pronouncement as to contractual obligation; and we do not rule on other matters involved, upon which there were no findings or determinations by the trial court. One of these other matters concerns the differences between a bipartite credit card arrangement (such as is involved here) and a tripartite arrangement. See Comment, *The Tripartite Credit Card Transaction: A Legal Infant*, 48 Calif. L. Rev. 459 (1960). Another is the matter of any negligence on the part of the defendants in their custody of the plate or any negligence on the part of Denver Dry with respect to the purchases.

We simply hold that the court erred in ruling that, under the facts and in the absence of any contractual obligation, the defendants were liable for unauthorized purchases made prior to the time they gave notification that the card was lost or stolen. In the absence of other factors (such as negligence, bad faith or estoppel) which are not involved here, such a liability must be predicated upon a contractual obligation. *Thomas v. Central Charge Service*, 212 A.2d 533 (D.C. App.), 15 A.L.R.3d 1083; *Gulf Refining Co. v. Plotnick*, 24 Pa. D. & C. 147; and Annot., 15 A.L.R.3d 1086.

During the trial it was apparent that the judge's attention was directed largely toward the sixteen matters coming before him that day and toward compressing this case into the shortest possible time. Except for this we suspect that more material evidence would have been taken and more thorough treatment given to the law involved.

The judgment is reversed and the cause remanded to the trial court with directions to grant the defendants' motion for a new trial.

MR. CHIEF JUSTICE McWILLIAMS, MR. JUSTICE DAY and MR. JUSTICE KELLEY concur.